UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:05CV-014-H

DR. PHILIP C. TROVER                                                    PLAINTIFF

V.

DR. NEIL J. KLUGER and                                               DEFENDANTS
PAXTON MEDIA GROUP, L.L.C.

**MEMORANDUM OPINION**

Defendant Paxton Media Group ("Paxton Media" or "Defendant") publishes *The Messenger* in Madisonville, Kentucky.  In March 2004, it printed seven articles which generally concerned the Regional Medical Center and Plaintiff Dr. Philip Trover.  Subsequently, Dr. Trover brought claims of defamation, false light invasion of privacy, intentional infliction of emotional distress, and tortious interference with business relations arising from those articles.

Defendant has moved for summary judgment as to the defamation claims only, on the grounds that an Agreed Order between Dr. Trover and the Kentucky Board of Medical Licensure ("KBML") has the preclusive effect of *res judicata* as to several issues presented in this suit, that certain statements by Defendant were privileged, and that their publication is protected by the defense of truth.  That motion and the responses to it have raised a number of delicate questions of fact and law which affect the viability of the defamation claims.  For the reasons outlined below, the Court will dismiss many but not all of those claims in this action.

**I.**

The events leading us here began on January 24, 2004, when Dr. Neil Kluger wrote a letter ("the Kluger letter") to the Chief of Staff and the Medical Executive Committee of the

Regional Medical Center ("RMC"), a hospital owned and operated by the Trover Clinic

Foundation, Inc. (collectively, the "Hospital").  Dr. Kluger is an oncologist and was also on the

staff at the RMC.  Dr. Kluger's extensive letter recited a variety of concerns about the quality of

Dr. Trover's medical care and his professionalism.  The central thrust of Dr. Kluger's letter was

that Dr. Trover, a radiologist, misread diagnostic imaging results and failed to take the necessary

time to read them.  Dr. Kluger recommended that the Executive Committee terminate Dr.

Trover's clinical privileges.

On January 31, 2004, Dr. Kluger wrote a similar letter to Mark Eastin, Chairman of the

Board of Directors at the Hospital.  The same day, Dr. Kluger filed a complaint with the Office

of the Inspector General at the Kentucky Division of Health Services ("OIG"), the state authority

that administers the federal Medicare and Medicaid programs in Kentucky.  As part of that

complaint, Dr. Kluger incorporated his prior two letters.  One day later, Dr. Kluger filed a

complaint with the KBML, in which he also expressly incorporated the January 24, 2004 and

January 31, 2004 letters.  At some point thereafter, the KBML launched its own investigation.

Subsequently, the OIG launched an investigation and on February 27, 2004 it notified the

Hospital that its Medicare and Medicaid certification would be terminated unless the Hospital

instituted certain quality assurance procedures in its radiology department.  The Centers for

Medicare and Medicaid Services ("CMS") sent a letter to the Hospital the same day, threatening

to cut off Medicare and Medicaid funding unless the Hospital's radiology department came into

compliance.  The Hospital initiated a "Plan of Correction."  As a result, on March 18, 2004,

CMS notified the Hospital that its funding would not be cut.

Contemporaneously with the OIG investigation, the Hospital launched its own internal

investigation in response to Dr. Kluger's letter.  On February 20, 2004, the Medical Executive Committee formally voted to request corrective action of Dr. Trover.  In the interim, it suspended Dr. Trover's clinical privileges to read and interpret diagnostic imaging.  The Medical Executive Committee set up an *Ad Hoc* Committee to investigate the allegations against Dr. Trover and to issue findings and recommendations.  This Committee interviewed a number of physicians and other employees at the Hospital, and found that "there is a general lack of confidence in Dr. Trover's practice."  The *Ad Hoc* Committee recommended the suspension or revocation of Dr. Trover's clinical privileges.

As these investigations were ongoing, several individuals brought suit against Dr. Trover and the Hospital, claiming they had been harmed by Dr. Trover's misreading of their X-rays.  One case, styled *Cruce, et al.* v. *Trover, et al.*, ("the *Cruce* case") was filed in Hopkins County Circuit Court on March 17, 2004.  Though originally styled as a class action lawsuit, this case was never certified as such and has since been transformed into a conglomeration of numerous lawsuits against Dr. Trover.

Various media outlets and specifically Defendant's paper, *The Messenger*, covered all of these events.  Dr. Trover asserts that seven articles published by Paxton Media in March 2004 defamed him.  Before Dr. Trover filed this lawsuit, his attorney sent a letter dated January 17, 2005, (the "Demand Letter") demanding corrections be printed as to all seven articles.  As the specific language of and complaint made against each of these articles are important, the Court will summarize each separately:

- The March 3, 2004 article: Dr. Trover alleges that this article accuses him of "gross negligence in failing to correctly read X-ray films."  *See* Complaint at 6.

3

The Demand Letter specifically asserts that the article erroneously reported that the review of films at the Hospital was triggered by "discrepancies in the readings of films and subsequent findings by other physicians" noticed by staff in the Radiology Department, when in fact D. Kluger's letter triggered the review.

- The March 4, 2004 editorial: Dr. Trover alleges that this editorial was defamatory because it implied that he was guilty of gross negligence and of causing a crisis for the hospital.  Specifically, Dr. Trover asserts that the editorial used language (including the phrase that the revelations at the Hospital sent "shock waves" through the community and required "heavy-duty 'damage control' measures) that implied that he was grossly negligent.

- The March 5, 2004 article: Once again, Dr. Trover asserts that this article accused or implied that he was grossly negligent and posed a danger to his patients.  The Demand Letter makes no mention of the article.

- The March 6, 2004 article: Dr. Trover asserts that this article also implied that he was grossly negligent and posed a danger to his patients.  Dr. Trover, though his attorney, made a series of more specific allegations regarding this article in his Demand Letter.  These allegations and complaints include:

  < That the article falsely implied that the Kluger letter, from which it quotes extensively, was a formal complaint before a court or administrative body, as opposed to a private letter to the Chief of Staff of the RMC.

  < That the "net effect" of the article is that Dr. Trover is a grossly negligent, dangerous physician.  Dr. Trover disputes this characterization and asserts

4

that he is a well-trained, well-qualified physician.

&lt; That the story relayed in the article via Dr. Kluger's letter alleging that Dr. Trover mis-diagnosed an abscess, subsequently causing a patient's death, was "wrong and fictitious."

&lt; That the article implied that Dr. Trover's work was deficient "from the time he became a physician."  Dr. Trover disputes this and asserts that he knew of no formal or informal complaints against him prior to the actions involved in this case.

&lt; That the article falsely implies that Dr. Trover was responsible for putting the hospital at serious risk of losing Medicare and Medicaid payments.

&lt; That the article falsely implied that Dr. Trover took four seconds to read mammograms.

&lt; That the article quoted Dr. Kluger as saying "I am very concerned that [Dr. Trover] may be continuing to harm patients," implying that Dr. Trover had harmed patients in the past and was continuing to do so.

&lt; That the article quotes Dr. Kluger as saying that other physicians had previously complained about Dr. Trover's work, when that was not the case.

&lt; That the article states that Dr. Kluger was "barred from the Radiology Department at the hospital," when in fact the Medical Executive Committee had suspended only his ability to read and interpret diagnostic imaging.

&lt; That the article states that Dr. Kluger's complaint asserts that Dr. Trover has mental health problems; that he was protected from reprisal because his father was Dr. Loman Trover, founder of the hospital; and that he put at least two patients into renal failure while attempting to put in renal stints.  Dr. Trover asserts that none of these allegations are true.

&lt; That the article alleges that Dr. Trover once mis-diagnosed a bone fracture, on an X-ray, even though the bone was protruding from the patient's skin.  Dr. Trover asserts that this incident never occurred.

&lt; That the article reports the reference in Dr. Kluger's letter to Dr. Trover being "functionally blind," a statement Dr. Trover asserts is not true "literally or figuratively."

- <u>The March 13, 2004 article</u>: Dr. Trover alleges that this article implied that he was being negligent and being at the center of federal reviews.  This article states that Dr. Trover was "at the center of internal and federal reviews" and "suspected of failing to fulfill his duties."  Dr. Trover states that he was never under federal reviews and was not "suspected" of failing to fulfill his duties, but rather accused by Dr. Kluger of doing so.

- <u>The March 18, 2004 article:</u> This article quotes John Whitfield, attorney for the plaintiffs in the *Croce* lawsuit, as saying that "In fact [X-rays, mammograms, and CT scans] were misread, or even worse, not read at all."  Dr. Trover asserts that this claim is untrue.

- <u>The March 31, 2004 article:</u> Dr. Trover asserts that this article states or implies

that multiple complaints were filed against him in connection with his

professional work as a radiologist.  This article quotes John Whitfield as saying

that his belief that a problem had existed in the Radiology Department for some

time was "based on complaints field against [Dr. Trover] by his peers at [RMC]."

Dr. Trover asserts that Dr. Kluger's letter constituted the only complaint filed in

writing against him.

As the newspaper articles appeared, the investigations of the Hospital, the OIG and the

KBML continued.  On April 20, 2004, the Medical Executive Committee recommended that Dr.

Trover's clinical privileges be revoked in their entirety.  On April 29, 2004, the Hospital's Board

of Directors terminated Dr. Trover's employment with the Hospital.  According to the Hospital,

the termination was not for cause.

On July 14, 2005, the KBML entered an Emergency Order of Suspension, which

prohibited Dr. Trover from practicing medicine in Kentucky.  On April 13, 2006, the KBML

entered an Agreed Order with Dr. Trover.  As part of the Agreed Order, Dr. Trover and the

KBML stipulated that "if an evidentiary hearing were to take place, the [KBML] could conclude

from the evidence presented that the licensee has engaged in conduct which violated KRS

311.595(9) as illustrated by KRS 311.597(3) & (4) and KRS 311.595(21)."[1]  Under the Agreed

---

[1]  These statutory provisions generally allow the KBML to suspend the medical license  of one found
engaging in "dishonorable, unethical or unprofessional conduct" likely to harm the public or failing to conform to
the acceptable and prevailing standards of medical practice in Kentucky. KRS 311.595, provides in part:

...[T]he board may . . . limit or restrict a license for an indefinite period . . . upon proof that the licensee has:

(9) Engaged in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud,
or harm the public or any member thereof;

(21) Been disciplined by a licensed hospital or medical staff of the hospital, including removal, suspension,
limitation of hospital privileges, failing to renew privileges for cause, resignation of privileges under

Order. Dr. Trover's medical license was restored, but certain restrictions and conditions were placed indefinitely upon it.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, "summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On summary judgment, the evidence before the Court must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006). Before considering summary judgment, however, the Court must resolve a preliminary legal issue.

## II.

Paxton Media's initial argument is that the KBML proceedings and the doctrine of issue preclusion (also known as collateral estoppel) act to bar many of Dr. Trover's claims. Under this doctrine, a party is barred from re-litigating any issue actually litigated and finally decided in an

---

pressure or investigation, or other disciplinary action if the action was based upon what the hospital or medical staff found to be unprofessional conduct, professional incompetence, malpractice, or a violation of any provisions of KRS Chapter 311. This subsection shall not require relitigation of the disciplinary action.

KRS § 311.595 provides:

As used in KRS 311.595(9), "dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public or any member thereof" shall include but not be limited to the following acts by a licensee:

(3) A serious act, or a pattern of acts committed during the course of his medical practice which, under the attendant circumstances, would be deemed to be *gross incompetence, gross ignorance, gross negligence, or malpractice*.

(4) Conduct which is calculated or has the effect of bringing the medical profession into disrepute, including but not limited to any departure from, or failure to conform to the standards of acceptable and prevailing medical practice within the Commonwealth of Kentucky, and any departure from, or failure to conform to the principles of medical ethics of the American Medical Association or the code of ethics of the American Osteopathic Association. For the purposes of this subsection, actual injury to a patient need not be established.

earlier action. *Buis v. Elliot*, 142 S.W.3d 137, 140 (Ky. 2004) (citing *Yeoman v. Commonwealth Health Policy Bd.*, 983 S.W.2d 459, 464 (Ky. 1998)).  Under Kentucky law, to apply issue preclusion requires four elements.  First, the issue in the second proceeding must be the same as the issue in the first.  *Yeoman*, 983 S.W.2d at 465.  Second, the issue must have been actually litigated.  *Id.*  Third, the issue must have been actually decided.  *Id.*  Fourth, the decision on the issue must have been a necessary component of the prior proceeding.  *Id.*  The Court concludes that Defendant cannot meet all of the necessary elements.

Here, there is no question that several issues central to this litigation were also at issue in the KBML proceedings: specifically, whether Dr. Trover was guilty of gross negligence and whether he constituted a danger to patients and to the public.  Other issues are discussed peripherally in *The Messenger*'s articles and in Dr. Trover's Complaint, but these two issues form the basis of Dr. Trover's defamation claim.  Dr. Trover argues that because the KBML Agreed Order provides for the informal disposition of the complaints, the accompanying findings under KRS 311.595 were unnecessary to its entry.  *See* 201 Ky. Admin. Regs. 9:082 (allowing the KBML general counsel to negotiate "informal dispensation" of a complaint).  However, even when a complaint against a physician is resolved via "informal dispensation," for the KBML to limit or restrict a physician's license, KRS 311.595 requires the KBML to find "proof" that the licensee engaged in conduct prohibited by statute.  Here, the Agreed Order specifically laid out the KBML's possible findings, based on *proof sufficient for the statute's purposes* that Dr. Trover had engaged in conduct that constituted "gross incompetence, gross ignorance, gross negligence, or malpractice."          Thus, Defendant meets the first prong of the *Yeoman* test.

Under the second prong of the *Yeoman* test, issue preclusion applies "only if the party

against whom it is sought to be applied had a realistically full and fair opportunity to litigate this issue." *Berrier v. Bizer*, 57 S.W.3d 271, 281 (Ky. 2001). Defendant says that Dr. Trover had such an opportunity in the KBML proceeding. *Yeoman* requires, however, that the issue be *actually* litigated. 983 S.W.2d at 465. The *Yeoman* court looked to the Restatement (Second) of Judgments to define this prong of the test. *Id.* The Restatement says that "[w]hen an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated within the meaning of this Section." Restatement (Second) of Judgments § 27 cmt. d. The requirements of collateral estoppel are precise. One is that an issue be litigated, not settled. The reason for this is that the collateral consequences of settling issues in one context may vary considerably from settling those in a different context. The doctrine of collateral estoppel allows  a party some flexibility to resolve one dispute without the settlement affecting another separate proceeding.

        Here, Dr. Trover may have had the "opportunity" to litigate this issue in the sense that he could have proceeded to more formal KBML proceedings. Instead, Dr. Trover chose to sign the KBML Agreed Order agreeing to a resolution of specific factual conclusions. He agreed to these conclusions in lieu of litigation, and thus,  no "actual" litigation of the issues occurred. Moreover, the Agreed Order did not satisfy the spirit or letter of Restatement (Second) of Judgments § 27.[2] The reason is that these factual issues were not decided, rather only resolved for purposes of concluding medical license investigation. Therefore, the settlement here is something less than that which the doctrine of collateral estoppel very precisely requires.

---

        [2] *See also id.* at § 27 cmt. e ("In the case of a judgment entered by confession, *consent*, or default, none of the issues is actually litigated . . . The judgment may be conclusive, however, with respect to one or more issues, *if the parties have entered an agreement manifesting such an intention*") (emphasis added).

Defendant has not met the requirement of litigation under the *Yeoman* test.  Based on this analysis, the doctrine of collateral estoppel will not operate as a bar to Plaintiff's defamation claims.

### III.

Because these claims survive collateral estoppel, the Court must review now the specific allegations as they apply to the law of defamation.  Cases such as this implicate the First Amendment because the state defamation law can act to limit the newspaper's free speech rights. To make a *prima facie* case of defamation under Kentucky law, a plaintiff must first show false and defamatory language concerning him.  *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004).  He must also show that the language was published and caused injury to his reputation.  *Id.*  Further, he must also show that the defendant acted negligently.  *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 886 (Ky. 1981).  In determining whether a defendant published a defamatory matter negligently, "(t)he appropriate question to be determined from a preponderance of the evidence is whether the defendant exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it."  *Id.* (citing *Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412, 418 (Tenn. 1978)).

Plaintiff bears the burden of proving that an alleged defamatory statement is false. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990).  Kentucky also recognizes the doctrine of "substantial truth," which mandates that technical inaccuracies in a news report are not defamatory if they are "substantially true."  *See Bell v. Courier-Journal & Louisville Times Co.*, 402 S.W.2d 84, 87 (Ky. 1966).  This test has been described as an inquiry into whether

inaccuracies in the article could have "appreciably affected their defamatory result" by adding to the defamatory "gist or sting" of the article as a whole. *Pearce v. Courier-Journal*, 683 S.W.2d 633, 635, 637.

The Court will examine the newspaper articles focusing on two issues:  (1) whether the evidence for a reasonable jury to find for Plaintiff as to any particular claim is simply insufficient and (2) whether the fair reporting privilege bars certain claims.  The Court will consider the contents of each letter in turn.

<center>A.</center>

Dr. Trover alleges that the March 3, 2004 article contains one false statement of fact: that the Hospital's radiology department staff prompted the Hospital's review of X-rays, when in fact, Dr. Kluger – an oncologist – had prompted the review.[3]  This statement is not "of and concerning" Dr. Trover, as *Stringer* requires, because the allegedly false part of the statement only discusses how any irregularities were discovered, not Dr. Trover's conduct or whether he was responsible for the irregularities.  *Stringer*, 151 S.W.3d at 793.  Therefore, Dr. Trover does not state a *prima facie* case of defamation on this subject.

Furthermore, on the facts presented to the Court, Dr. Trover's remaining contentions related to this article – that the CMS letter was prompted by problems with the Hospital's quality assurance program in the Radiology Department, as opposed to the allegations against him – fail because they do not support a defamation claim. The CMS letter was plainly triggered by Dr. Kluger's allegations regarding Dr. Trover's performance.  The Radiology Department may have

---

[3] This allegation is contained in the Demand Letter, but not in the complaint.  The exact text of the complained-of paragraph follows: "The review of films from January 2003 to present began more than a week ago after staff in the Radiology Department noticed discrepancies in the readings of films and subsequent findings by other physicians."

<center>12</center>

been the direct subject of the review, but the fact remains that Dr. Trover was the only working radiologist in the Department at the time of the CMS review.

<div align="center">B.</div>

Dr. Trover alleges that the March 4, 2004 editorial was defamatory because it implied his gross negligence and that he caused a crisis for the hospital. However, Dr. Trover points to no such specific false statements of fact in this editorial.

The evidence presented to the Court indicates that, whatever the underlying truth of Dr. Kluger's allegations against Dr. Trover, the allegations did cause "serious problems" for the Hospital, they did cause the Hospital to engage in "heavy-duty damage control," and they did send alarm – if not "shock waves" – through the community. Furthermore, the colorful phrases used by the editorial – including the terms "shock waves," "heavy-duty damage control," and "serious problems" – constitute classic "rhetorical hyperbole," which defy precise definition and cannot, therefore, be proved false. *Welch v. American Publishing Co. of Kentucky*, 3 S.W.3d 724, 730 (Ky. 1999).

Therefore, none of these statements can support a defamation claim.

<div align="center">C.</div>

The March 5 and 13 articles follow a similar analysis. Dr. Trover has alleged no specific false statements of fact in the March 5, 2004 article – only that the "gist" of the article was that he was grossly negligent and constituted a danger to patients. The "natural and probable effect on the mind of the average lay reader" of this article would be that the "alleged failings" of Dr. Trover triggered the CMS review of the hospital. Dr. Trover again asserts that problems with quality assurance program of the Hospital's Radiology Department triggered the CMS review.

<div align="center">13</div>

In fact, Dr. Kluger's letter, which specifically discussed Dr. Trover's alleged shortcomings, triggered the CMS review.  The March 13, 2004 article fits the same general pattern as the March 3 and March 5, 2004 articles.  Dr. Trover alleges that it implies that he was at the center of the federal reviews of the Hospital, while he contends that the Hospital's polices and procedures were actually in question.

From the evidence presented to the Court, the Court concludes that Dr. Trover would be unable to meet his burden under *Milkovich* that the statements in the March 5 and March 13, 2004 articles are false.

<div align="center">D.</div>

The March 18 and 31 articles report and discuss the *Croce* lawsuit, which was filed in a local circuit court during the previous week.  The Kentucky legislature has codified the fair reporting privilege.  KRS 411.060 provides in relevant part that:

> The publication of a fair and impartial report or the whole or a synopsis of any indictment, warrant, affidavit, pleading or other document in any criminal or civil action in any court of competent jurisdiction shall be privileged, unless it is proved that it was published maliciously . . . .

KRS § 411.060.  The Kentucky Supreme Court has rejected the concept of "neutral reportage" of allegations.  *See McCall*, 623 S.W.2d at 886.  However, a newspaper article that is an accurate account of judicial or administrative proceedings, regardless of the falsity or defamatory character of its contents, is absolutely privileged, unless its actual publication was malicious (that is, made solely for the purpose of causing harm to the person defamed).  *Pearce*, 683 S.W.2d at 636.

Having reviewed the Complaint in the *Croce* lawsuit and the content of the March 18,

<div align="center">14</div>

2004 article, the Court finds that the content of that article easily satisfies the standards of KRS 411.060.  Some portions of the article merely summarize the complaint.[4]  Any fair reading of these portions of the article would indicate that they constitute a summary of the *Croce* allegations, not statements of verified facts.  Other portions of the article quote attorney John Whitfield.  Whitfield's direct quotes simply add "meat" to the bare bones of the complaint, but do not in any way go outside the allegations contained therein.[5]  *Compare Pearce*, 683 S.W. 2d at 637 (finding that a "factually inaccurate" statement that was "apparently not a substantially accurate account of the judicial proceedings which were the main topic of the article" was not protected by the judicial reporting privilege).  Therefore, contents of the March 18, 2004 article will not support a defamation claim because they are privileged under KRS 411.060.

---

[4] The article is replete with language that makes it clear that the article is summarizing the *Croce* complaint.  Some of that language includes the following:
- "Madisonville attorney John Whitfield said his clients *were suing because they believed* their X-rays, mammograms, and CT scans were being read accurately by Trover" (emphasis added).
- "*In the lawsuit*, Whitfield said other physicians in the past 10 years have complained to Trover Foundation management about Trover's performance of his medical duties as well as questioning his anger management and mental stability, but were told 'there's not a problem' and 'there's nothing we can do about it'" (emphasis added).
- "*The lawsuit said* Trover owed a duty to treat plaintiffs within the appropriate acceptable medical standards and that he breached his duty when he deviated from that standard and was negligent in the performance of his duty" (emphasis added).
- "*Whitfield said* that because of the alleged negligence, his clients have sustained physical injuries, pain and suffering, lost wages, fright, shock, and/or other types of mental anguish both [sic] in the past and will continue to do so in the future" (emphasis added).

[5] Some of Whitfield's quotes in the article include the following:
- "In fact, [the radiology tests] were misread, or even worse, not read at all. That is absolutely frightening for my clients and to everyone."
- "In theory, the classes affected by [Dr. Trover'a alleged negligence] would suffer emotionally by having their X-rays, mammograms and CT scans read incorrectly.  You can envision those people would have significant damage, particularly if that person had cancer."
- "The [OIG] inspection revealed the quality assurance measures for the radiology department at RMC were insufficient."
- "We base [plaintiffs' claim that Dr. Trover's work has been in question for the past ten years] on our research.  We believe problems with his (Trover's) work go back to 1994."
- "We think there are hundreds, maybe thousands, of people affected."
- "Plaintiffs have lost the chance to obtain proper treatment due to Dr. Trover's negligence."

The March 31, 2004 article is similar in content to the March 18, 2004 article.  The allegedly defamatory comments attributed to Whitfield simply elaborate upon the allegations made in the *Croce* complaint and are therefore privileged under KRS 411.060.  For the same reasons, its contents do not support a defamation claim.

F.

Finally, the Court will discuss the March 6, 2004 article in some detail.  Among other things, this article includes a detailed account of Dr. Kluger's letter.  Paxton Media contends that the fair report privilege applies, because the Kluger letter was a "document presented, filed or used in any proceeding before any state or city legislative or executive body, board or officer" and thus any "fair and impartial" report thereof was protected.  KRS § 411.060.

1.

The article does correctly state that Dr. Kluger's nine-page complaint "spawned" the internal review of the RMC's Radiology Department.  Thus, an initial question presented is whether the fair reporting privilege applies only to governmental investigations or whether it also can apply to internal private investigations.  The private, internal investigation of the Medical Executive Committee of the Hospital is unlike a judicial proceeding or a governmental agency investigation that ultimately become public knowledge in some form.  Kentucky courts have never interpreted the fair reporting privilege as set forth in KRS 411.160 to extend to private investigations.  Therefore, the Court must look for a different connection between the Kluger letter and an ongoing investigation.

It is true that the Dr. Kluger had included his letter as part of his complaint to the KBML.  The KBML proceedings are the type that could qualify for the fair reporting privilege.  At the

16

time of the publication of this article, however, it appears that Paxton Media may not have been aware that the letter was a "document presented" to any state or city body–either the KBML or the OIG.  Paxton Media argues that such knowledge is not required for the fair reporting privilege to apply, but points to no case or other authority that would support its own view.  The Court must make the most informed judgment whether Kentucky courts would extend the fair reporting privilege to these circumstances.

KRS 411.060 does not directly impose the "knowledge" requirement and no Kentucky courts have addressed the question.[6]  Many states have similar statutory or common law fair report privileges.  Typically, those courts have found that the policy behind the privilege is one of allowing the press to freely serve as a kind of "government watchdog."[7]  Here, Paxton Media could not be serving as a "government watchdog" in publishing the March 6 article for the simple reason that it did not know it was reporting on the activities of the government.  To apply the privilege in these circumstances would seem to be inconsistent with its policy rationale. To expand KRS 411.060 in such a way to include all proceedings  – known or unknown –  pending before a state or city government would constitute a dramatic expansion of the fair reporting

---

[6]  In construing a statute, the appellate court must consider the purpose which the statute is intended to accomplish – that is the reason and spirit of the statute – and the mischief intended to be remedied. *Barker v. Commonwealth*, 32 S.W.3d 515, 516-17 (Ky. App. 2000).  When the state courts of the state in which a federal judge sits have not conclusively addressed an issue, it falls to the federal court to review the question "in light of practical and policy considerations, the treatment of other similar rights in our legal system, [and] and the relative weight of the conflicting interests of the parties . . ." *Memphis Development Foundation v. Factors Etc., Inc.*, 616 F.2d 956, 958 (6th Cir. 1980) (interpreting the question of whether the exclusive right to publicity survives a celebrity's death as an issue of first impression under Tennessee law).

[7]  *See, e.g.*, *Friedman v. Israel Labour Party*, 957 F.Supp. 701, 711-12 (E.D. Pa. 1997) (stating that one of the policy rationales for the fair report privilege is the supervisory interest of the press to inform the public about the working of government); *Costello v. Ocean County Observer,* 136 A.2d 1012, 1018 (N.J. 1994) (holding that the public policy underlying the fair-report privilege is to foster the public's awareness of what actually happens at public proceedings); *McClatchy Newspapers, Inc. v. Superior Court*, 189 Cal.App.3d 961, 975 (Cal. Ct. App. 1987) (interpreting California Civil Code § 47(d) and holding that "[t]he fair report privilege is required because of the public's need for information to fulfill its supervisory role over government").

17

privilege.  The Court finds no support for such a result in the Kentucky cases, the cases in other

states, or in the rationale of the privilege itself.  For these reasons, the Court will decline to

extend the privilege to these circumstances at this time.

<div align="center">2.</div>

As a consequence, the Court must analyze the motion for summary judgment under the

standard defamation tests.  At this stage of the litigation, adequate evidence exists to call into

doubt the truth of the allegations made by Dr. Kluger and reprinted by Paxton Media in the

March 6, 2004 article.  Plaintiff has submitted letters from the Trover Foundation to the

Kentucky Board of Medical Licensure dated August 10, 2005, and August 22, 2005, detailing

the results of an "exhaustive review" of Dr. Trover's work.  These letters indicated that the error

rates of Dr. Trover's reading of films were "completely within all acceptable standards of care."

While this information was disclosed by the Trover Foundation roughly seventeen months after

the publication of the March 6, 2004 article  – long after the article's original publication – it

certainly raises the question of "whether the defendant exercised reasonable care and caution in

checking on the truth or falsity and the defamatory character of the communication before

publishing it."  *McCall*, 623 S.W.2d at 886.

The Court has already discussed other articles that contained material mentioned in the

March 6, 2004 article; specifically, the March 6, 2004 article implies – as do several other

articles – that Dr. Kluger's complaint against Dr. Trover triggered the CMS review and placed

the hospital at serious risk of losing federal funding.  To be consistent with its previous rulings

on this subject, the Court will correspondingly grant summary judgment in favor of Paxton

<div align="center">18</div>

Media as to Dr. Trover's allegation that the March 6, 2004 article falsely implies that Dr. Kluger's complaint about Dr. Trover was responsible for the CMS review and for putting the hospital at serious risk of losing Medicare and Medicaid payments.  However, genuine issues of material fact remain as to most of the March 6, 2004 article and summary judgment as to this article will be denied.

  The Court will enter an order consistent with this Memorandum Opinion.

cc:  Counsel of Record