UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:05CV-014-H

DR. PHILIP C. TROVER                                                              PLAINTIFF

V.

PAXTON MEDIA GROUP, L.L.C.                                              DEFENDANT

**MEMORANDUM OPINION**

Plaintiff Philip Trover has brought claims of defamation, false light invasion of privacy, intentional infliction of emotional distress, and tortious interference with business relations against Defendant Paxton Media Group, based on Defendant's publication in March 2004 of a series of articles in *The Messenger*, its newspaper in Madisonville, Kentucky.  In a prior opinion, the Court dismissed most of Plaintiff's defamation claims.  What remains of Plaintiff's complaint is a single defamation claim as to certain aspects of the March 6 article and other state law tort claims pertaining to all of the articles.  Defendant has moved now for summary judgment on all of these remaining claims.

The motion requires the Court to define the extent to which the First Amendment limits Plaintiff's enforcement of a legal remedy for defamation under Kentucky law.  The Supreme Court and the Sixth Circuit have only vaguely sketched out the extent to which the First Amendment may protect speech concerning one who involuntarily finds himself part of a particular public controversy.  This Court must take their limited offerings and apply the doctrine to the hard facts of this case.  After doing so, the Court concludes that Plaintiff did not voluntarily or involuntarily become a limited purpose public figure for First Amendment

purposes.  Therefore his defamation claim may proceed to trial under a negligence standard, since material disputed facts remain as to this underlying claim.  For the reasons discussed below, the Court also will deny the motion as to Plaintiff's false light invasion of privacy claim arising from the March 6, 2004 article.  The Court will grant the motion as to the remainder of Plaintiff's claims.

## I.

The events surrounding this case were discussed at length in the Court's prior opinion, making only a brief recapitulation necessary here.  In January 2004, Dr. Neil Kluger, an oncologist on the staff of the Regional Medical Center ("RMC") wrote a letter to the RMC's Chief of Staff and Medical Executive Committee, in which he listed numerous concerns regarding the work of Plaintiff, who was then a radiologist at RMC.  In his letter, Dr. Kluger recommended that the RMC terminate Plaintiff's clinical privileges.  Dr. Kluger also filed complaints with the Kentucky Division of Health Services and the Kentucky Board of Medical Licensure, in which he included the allegations made in his letter to RMC.

The Division of Health Services, the Board of Medical Licensure, and RMC all initiated investigations into Plaintiff's work.  The Division of Health Services determined that RMC was at risk of losing its Medicare and Medicaid certification.  RMC suspended Plaintiff's clinical privileges to read and interpret diagnostic imaging.   Several patients filed lawsuits against Plaintiff and RMC claiming harm due to misreading of their diagnostic imaging.

On March 3, 2004, the Trover Foundation ("the Foundation"), which owned and operated RMC, took out a full-page advertisement in *The Messenger* to print "A Letter to the

2

Community," in which it discussed "concerns [that] have been raised about a physician's interpretation of some patient x-rays and mammograms," and assured readers that "[t]he doctor whose radiology work has been challenged is no longer reading x-rays or mammograms pending completion of the review." Defendant's Second Motion for Summary Judgment, Exhibit 1. The Foundation also discussed the measures it was taking to remedy any concerns and deficiencies in care. *Id.*

On March 18, 2004, after reviewing RMC's "Plan of Correction," the Center for Medicare and Medicaid Services ("CMS") notified RMC that it was no longer at risk of losing its Medicare and Medicaid funding. Nevertheless, RMC revoked Plaintiff's clinical privileges in April 2004, and terminated his employment just over a week later. In July 2005 the Board of Medical Licensing prohibited Plaintiff from practicing medicine in Kentucky.

Various media outlets reported these events, and Plaintiff's claims focus on articles published in *The Messenger* on March 3, 4, 5, 6, 13, 18, and 31. In its February 14, 2007, opinion, this Court found that the March 3, 4, 5, and 13 articles could not form the basis for a defamation claim, since they were at a minimum substantially true. Similarly, the Court found that the March 18 and 31 articles could not form the basis for a defamation claim since they were protected by the "fair reporting" privilege under Ky. Rev. Stat. § 411.060. Finally, the Court found that the March 6 article's assertion that Plaintiff was responsible for RMC being at risk of losing its Medicare and Medicaid certification could not form the basis of a defamation claim.

Defendant's latest motion raises delicate issues about the viability of the remaining claims, particularly those for defamation. Defendant argues that the First Amendment protects its actions from suit under a state negligence standard because Plaintiff is a public figure.

3

II.

To make out a *prima facie* case of defamation under Kentucky law, a plaintiff must prove the existence of (1) defamatory language, (2) about the plaintiff, (3) which is published, and (4) which causes injury to reputation. *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004). For private figures, Kentucky law only requires that plaintiffs show the alleged defamer's negligence. *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 886 (Ky. 1981). State defamation laws inevitably conflict with the First Amendment where directed against public figures or those deeply intertwined with a public controversy. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342 (1974) ("Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury"); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 153 (1967) (acknowledging "the antithesis between civil libel actions and the freedom of speech and press"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269–70 (1964). Over the years the Supreme Court has defined a compromise between legitimate state defamation remedies for its citizens to protect their good name and the protection of equally important discussion of public issues and the individuals involved. *See Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 163–64 (1979) (summarizing the Court's efforts to do so). In some areas its definition has been more precise than in others.

Without doubt, the First Amendment restricts state law defamation claims against public officials and other public figures by requiring a showing of actual malice to recover. *See Curtis Publ'g Co.,* 388 U.S. at 162 (Warren, C.J., concurring in result).[1] The theory is that even though

---

[1]As noted in *Gertz*, Chief Justice Warren's concurring opinion, which received the support of five members of the Court, "stated the principle for which [*Curtis Publ'ng Co.* and its companion case] stand–that the *New York Times* test reaches both public figures and public officials." *Gertz,* 418 U.S. at 337 n.7.

4

an "erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate." *Gertz,* 418 U.S. at 340. Because the punishment of mere error would inevitably chill the exercise of constitutionally protected freedom of speech concerning those in public life, the heightened standard of proof is deemed essential in such circumstances. *N.Y. Times Co.*, 376 U.S. at 271–72 (internal citations omitted). The Supreme Court has justified this heightened requirement because public figures "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Gertz,* 418 U.S. at 344. Also, they have ordinarily chosen to "run[] the risk of closer public scrutiny . . . [and they] invite[] attention and comment" by virtue of their status. *Id.*

The Supreme Court has identified two types of public figures.[2] The first and perhaps most readily understood type is the so-called "all-purpose" or "general purpose" public figure. Such individuals are designated as a public figure "for all purposes and in all contexts," since they have achieved "pervasive fame or notoriety." *Gertz,* 418 U.S. at 351.

The second type of public figure, the so-called "limited purpose public figure," is found "[m]ore commonly,"*id.*, but is less amenable to straightforward characterization. Such individuals are otherwise private figures, but have become involved in "a particular public controversy" and are considered public figures to that controversy only. *Id.; see also Warford v.*

---

[2]The Sixth Circuit appears to echo the Supreme Court and divide public figures into two categories: all-purpose and limited-purpose. *See, e.g., Clark v. Am. Broad. Cos., Inc.*, 684 F.2d 1208, 1217–19 (6th Cir. 1982). In contrast, the Fourth Circuit divides public figures into three categories: all-purpose, limited-purpose, and involuntary. *Wells v. Liddy*, 186 F.3d 505, 532 (4th Cir. 1999). The Sixth Circuit's approach, to the extent it seems to identify involuntary public figures as a subset of limited purpose public figures, appears to this Court to be the approach most faithful to *Gertz*. *See Gertz*, 418 U.S. at 351 (noting that "designation [as a public figure] may rest on either of two alternative bases"); *see also Wolston*, 443 U.S. at 164–65 (1979) (identifying only two categories of public figures and examining the voluntariness question as part of the limited purpose public figure analysis).

*Lexington Herald-Leader Co.,* 789 S.W.2d 758 (Ky. 1990) (adopting and explaining the line of United States Supreme Court First Amendment cases up to and including *Gertz,* as well as those applying *Gertz*).  This group is further divided into two subsets.  Most limited purpose public figures are designated as such because they "voluntarily inject[]" themselves into the particular public controversy.  *Gertz,* 418 U.S. at 351.  The Supreme Court also suggested that "[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own," but then immediately cautioned that these so-called "involuntary public figures must be exceedingly rare."[3]  *Id.* at 345.  It is these ill-defined far reaches of First Amendment protection that this Court must carefully explore in order to determine whether Plaintiff is one of the "exceedingly rare" involuntary public figures.

In the wake of *Gertz* the D.C. Circuit staked out an aggressive position, expanding First Amendment jurisprudence under the involuntary public figure concept.[4]  That circuit said that where a plaintiff "was a central figure, however involuntarily, in the discrete and specific public controversy with respect to which he was allegedly defamed. . . .[he] was an involuntary public figure for the very limited purpose of discussion of" the public controversy at issue, despite having taken no voluntary action to become a public figure.  *Dameron v. Wash. Magazine, Inc.,*

---

[3] The Supreme Court has adhered to this admonition on subsequent occasions by declining to find involuntary public figures in two cases.  *See Hutchinson v. Proxmire,* 443 U.S. 111, 135 (1979) ("those charged with defamation cannot, by their own conduct, create their own defense by making claimant a public figure"); *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166–67 (1979) (noting that one is not made into a public figure simply by being "dragged unwillingly into [a public] controversy. . . .[or] just by becoming involved in or associated with a matter that attracts public attention").

[4] The D.C. Circuit was not the first post-*Gertz* court to consider the idea of treating a plaintiff as a public figure who had not voluntarily assumed a public role, *see, e.g., Carson v. Allied News Co.,* 529 F.2d 206 (7th Cir. 1976), but the D.C. Circuit's holding in *Dameron v. Wash. Magazine, Inc*., 779 F.2d 736 (D.C. Cir. 1985) is considered a leading case expanding upon the involuntary public figure idea.

779 F.2d 736, 742–43 (D.C. Cir. 1985); *see also Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1298 (D.C. Cir. 1980) ("Occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome.  Unless he rejects any role in the debate, he too has 'invited comment' relating to the issue at hand."). Defendant asks this Court to adopt *Dameron*'s rather expansive view of the public figure doctrine and apply it here.

The reviews of *Dameron*, however, are mixed.  The Fourth Circuit has expressed the most persuasive concern about *Dameron*'s breadth.  It concluded that *Dameron* risked contravening *Gertz's* rejection of the idea that private persons become public figures whenever the allegedly defamatory statements about them involve matters of public interest.  *Wells,* 186 F.3d at 539.  The court based its view on *Gertz*'s "two rationales" for allowing greater First Amendment protection for statements about public figures: (1) the fact that "the public figure can take better advantage of the free press and has an easier time resorting to self help because notoriety guarantees better access to the media and channels of communication," and (2) that "the public figure has taken actions through which he has voluntarily assumed the risk of publicity."  *Id.*  Based on these premises, the Fourth Circuit concluded that faithfulness to *Gertz* required a narrower involuntary public figure inquiry than expounded in *Dameron*.  It re-framed the inquiry, giving some consideration to the nature of the plaintiff's actions:

> First...the defendant must demonstrate to the court that the plaintiff has become a central figure in a significant public controversy, and that the allegedly defamatory statement has arisen in the course of discourse regarding the public matter....Second...the defendant must demonstrate that the plaintiff has taken some action, or failed to act when action was required, in circumstances in which a reasonable person would understand that publicity would likely inhere.

*Id.* at 539–40.  Likely reflecting both the ambiguities of the foundational cases in this area and the highly fact-specific nature of the involuntary public figure inquiry under any standard, other cases are equally mixed.  Some jurisdictions have adopted a broader, *Dameron*-like view of involuntary public figures.  *See, e.g., Zupnik v. Associated Press, Inc.*, 31 F.Supp.2d 70, 73 (D. Conn. 1998); *Lewis v. NewsChannel 5 Network, L.P.,* 2007 WL 1585163 (Tenn. Ct. App. 2007);[5] *Atlanta Journal-Constitution v. Jewell*, 555 S.E.2d 175, 186 (Ga. Ct. App. 2001); *Daniel Goldreyer, Ltd. v. Dow Jones & Co., Inc.*, 259 A.D.2d 353 (N.Y. App. Div. 1999); *Weigel v. Capital Times Co.*, 426 N.W.2d 43, 51 (Wis. Ct. App. 1988).[6]  Other jurisdictions, while sometimes acknowledging and even purporting to apply *Dameron*, find that the plaintiffs before them are not in the "exceedingly rare" category of involuntary public figures.  *See, e.g., Wells*, 186 F.3d at 539; *Wilson v. Daily Gazette Co.*, 588 S.E.2d 197, 208–09 (W. Va. 2003); *Moss v. Stockard*, 580 A.2d 1011, 1031 n. 35 (D.C. 1990); *Jacobson v. Rochester Cmty. Corp., Inc.*, 410

---

[5]In its Reply and at oral argument, Defendant relied heavily on *Lewis*, arguing that it "aptly demonstrate[s]" the "continued viability" of the involuntary public figure analysis.  Defendant's Reply at 7.  *Lewis* adopts a *Dameron*-like approach (albeit without mentioning *Dameron*), but the Court notes that at best, *Lewis* is merely an example from an intermediate state court outside Kentucky reading *Gertz* broadly, and that this Court does not dispute the existence of the idea of involuntary public figures.  Furthermore, the Court notes that in adopting the view that "[a]n involuntary public figure...may simply be an unfortunate victim of circumstance pulled into the whirlwind" caused by another's improper conduct, *Lewis*, 2007 WL 1585163 at *26, the Tennessee Court of Appeals articulates a broad standard aligned with that rejected by the Fourth Circuit.  See *Wells*, 186 F.3d at 539.

[6]Though seemingly an adoption of a *Dameron*-like approach, the Eleventh Circuit's decision in *Silvester v. Am. Broad. Cos., Inc.*, 839 F.2d 1491 (11th Cir. 1988) appears to have turned on the court's conclusion that the plaintiffs had voluntarily "thrust themselves" into the controversy.  839 F.2d at 1497.  Similarly, the Third Circuit's decision in *McDowell v. Paiewonsky*, 769 F.2d 942 (3d Cir. 1985) appears to be based on the conclusion that the plaintiff had "voluntarily assumed a position that invited attention," 769 F.2d at 950, which seems rarely to be the case for doctors who do not engage in self-promotional acts greater than those undertaken by Plaintiff.  S*ee generally* Tracy A. Bateman, Annotation, *Who is "public figure" for purposes of defamation action*, 19 A.L.R. 5th 1, § 38 (1994).  Similarly, the Supreme Court has rejected the idea "that any person who engages in criminal conduct automatically becomes a public figure for purposes of comment on a limited range of issues."  *Wolston*, 443 U.S. at 168.

Finally, the Seventh Circuit's pre-*Dameron* decision in *Carson* applied only a minimally rigorous analysis to find that "one can assume that the wife of a public figure...automatically becomes at least a part-time public figure herself."  529 F.2d at 210.

N.W.2d 830, 835 (Minn. 1987).

Neither the Sixth Circuit nor Kentucky courts have expressly entered the involuntary public figure discussion.  In *Street v. Nat'l Broad. Co.*, 645 F.2d 1227 (6th Cir. 1981), the Sixth Circuit hinted at a willingness to forego consideration of the degree to which a defamation plaintiff voluntarily involved herself in a public controversy, but did so in dicta before holding that such a voluntariness-free inquiry was unnecessary in the case before it.  645 F.2d at 1234–35.  The Court can find no post-*Dameron* Sixth Circuit case discussing *Dameron* or more directly addressing the idea of an involuntary limited purpose public figure.

In a case decided after *Dameron*, the Kentucky Supreme Court devoted significant attention to the First Amendment cases developing the public/private figure distinction, yet made no mention of *Dameron* and only noted the idea of involuntary limited purpose public figures in passing through a discussion of "*Gertz* and its progeny."  *Warford*, 789 S.W.2d at 771.  The court framed the limited purpose public figure test as follows:

> We must first look to a point in time before the defamatory statements generated their own controversy and ask: (1) in what particular and identifiable public controversy (2) did [plaintiff] by some voluntary act involve himself to the extent that he either assumed a role of public prominence, or was in a position to influence others or the outcome of the controversy, and (3) did [plaintiff] enjoy regular and continuing access to the media.

*Id.* at 766.  The criteria above are to be "weighted...differently in specific cases," *id.* at 767, and as *Gertz* instructs, courts must consider "'the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.'" *Id.* (citing *Gertz*, 418 U.S. at 352).[7]

---

[7]Citing *Gertz*, the Sixth Circuit has held that the "nature and extent" inquiry "is determined by considering three factors: first, the extent to which participation in the controversy is voluntary; second, the extent to which there is access to channels of effective communication in order to counteract false statements; and third, the prominence of the role played in the public controversy."  *Clark*, 684 F.2d at 1218; *Street*, 645 F.2d at 1234.  Given that the

Bearing all this in mind, this Court concludes that a *Wells*-type inquiry provides the better approach for determining those rare circumstances where one may involuntarily become a public figure for First Amendment purposes. The involuntary public figure doctrine's "origins in one sentence in *Gertz*" do not justify the D.C. Circuit's dramatic expansion of it. *Wells*, 186 F.3d at 538. Moreover, it is telling that at each post-*Gertz* opportunity to declare a plaintiff an involuntary public figure the Supreme Court has declined to do so. *See, e.g., Hutchinson,* 443 U.S. 111; *Wolston*, 443 U.S. 157. Thus, the *Dameron* formula seems far too expansive because it would dramatically increase the number of public figure status plaintiffs, making those instances anything but "exceedingly rare."

No one can deny that a public controversy did exist at the time the March 6, 2004 article was published.[8] RMC's owners had acknowledged the investigations and remedial measures responding to Plaintiff's work at RMC and the media had reported on it prior to March 6. The remedial measures were ongoing and still a source of concern to the community. Plaintiff's private actions were at the heart of what became a public controversy for RMC.

Nevertheless, the pertinent facts here weigh against finding Plaintiff to be even an involuntary public figure. Plaintiff at no point voluntarily involved himself in the controversy and he was not originally the focus of the story. Moreover, Plaintiff did not act in a manner designed to attain publicity or in a way to assume the risk of publicity, and Plaintiff was not a person with unusual access to the media. Thus, on balance, Plaintiff does not fit within *Wells's* formulation for that "exceedingly rare" group of involuntary public figures. On the facts here,

---

*Warford* formulation of the public figure inquiry appears to incorporate these considerations, there appears to be no divergence between the Sixth Circuit's approach and Kentucky's approach.

[8]The March 6, 2004, article did not, as in *Hutchinson*, create the controversy.

the Court will not characterize Plaintiff as a public figure.

Defendant suggests that by declining to designate Plaintiff a public figure, the Court is essentially saying that Defendant "simply should not have reported on anything relating to the RMC controversy."  Defendant's Second Motion for Summary Judgment at 27.  While the Court acknowledges the general point, with all due respect it disagrees with Defendant's severe view of the consequences of not following *Dameron*.  True, by declining to extend the protections of the actual malice standard to articles about Plaintiff appearing in *The Messenger*, the Court necessarily requires that the media be more cautious in reporting a particular story.  The lower standard does expose Defendant to some greater risk, particularly the risk associated with trial where the evidence is less than conclusive.  But this does not prevent the media from carefully reporting the story as it would any other.  More important, the *Wells* standard does not chill "uninhibited, robust, and wide-open" public debate in the press, *N.Y. Times Co.*, 376 U.S. at 270.  On the contrary, this Court has struck a faithful balance between "private personality and reputation [and] the need to assure the freedoms of speech and press that breathing space essential to their free exercise."  *Street*, 645 F.2d at 1233–34.

While Plaintiff's remaining defamation claim appears to be an uphill fight even under a negligence standard, no doubt disputes remain as to some material factual issues.

III.

In his Response, Plaintiff abandons his claims of false light invasion of privacy and intentional infliction of emotional distress as to all but the March 6, 18, and 31 articles. Plaintiff's Response at 38.  For the reasons discussed below, Plaintiff's intentional infliction of emotional distress claims fail as to those remaining articles, and his false light invasion of privacy claims fail as to all but the March 6 article.

A.

In order to make out a *prima facie* case of false light invasion of privacy, Plaintiff must show that (1) the false light in which he was placed would be highly offensive to a reasonable person, and (2) Defendant had knowledge of, or acted in reckless disregard of the falsity of the publicized matter and the false light in which Plaintiff was placed.  *McCall*, 623 S.W.2d at 888. Unlike the March 3, 4, 5, and 13 articles, which the Court held were not demonstrably false, the Court held that Defendant was shielded from defamation liability for the March 18 and 31 articles under Ky. Rev. Stat. § 411.060, the so-called "fair reporting privilege," which only considers whether the reports were "accurate account[s] of judicial and administrative proceedings."  *Pearce v. Courier-Journal & Louisville Times Co.*, 683 S.W.2d 633, 636 (Ky. Ct. App. 1985).  As the Court discussed, the privilege may only be overcome by a showing of malicious publication.  *See id.*

Having found that the March 18 and 31 articles were "accurate accounts," the Court fails to see how Plaintiff can satisfy either element of his false light claim as to those articles. Furthermore, the scope of the fair reporting privilege should preclude recovery on alternate tort theories once defamation claims are disallowed.  *See, e.g., Compuware Corp. v. Moody's*

12

*Investors Services, Inc.,* 499 F.3d 520, 533 (6th Cir. 2007) (expressing unwillingness to allow

"backdoor attempt[s] to assert a defamation claim" by pleading a different cause of action based

on the same conduct that was insufficient to support a defamation claim); *Boladian v. UMG*

*Recordings, Inc.,* 123 Fed. Appx. 165, 169 (6th Cir. 2005) ("A party may not skirt the

requirements of defamation law by pleading another related cause of action.") (internal citations

omitted); *Amway Corp. v. Proctor & Gamble Co.*, 346 F.3d 180 (6th Cir. 2003); *Gray v. Cent.*

*Bank & Trust Co.*, 562 S.W.2d 656 (Ky. Ct. App. 1978).

Given that Plaintiff's defamation claim as to some of the March 6 article survives,

however, these principles will not operate automatically to strike Plaintiff's alternate tort claims

as to that article.  The March 6 article essentially reports that Dr. Kluger's letter "spawned"

RMC's internal review of its Radiology Department, but on the evidence before the Court there

appears to be at the least a material issue of fact as to the elements of Plaintiff's false light

invasion of privacy claim, since when reporting a third party's allegations, "recklessness may be

found where there are obvious reasons to doubt the veracity of the informant or the accuracy of

his reports."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (quoting

*St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)) (internal quotation marks omitted).

While the topic of the March 6 article is certainly accurate, Dr. Kluger's specific

assertions reprinted therein are less obviously so.[9]  Many of Dr. Kluger's specific allegations,

which were reprinted more or less verbatim, border on outlandish and are at the very least in

dispute.  Dr. Kluger's letter unquestionably prompted RMC to investigate, but this fact does not

support an inference that no obvious reasons to doubt his veracity or accuracy on each allegation

---

[9]Such reprinted assertions include, for example, Dr. Kluger's allegation that Plaintiff "missed a bone
fracture on an X-ray, even though the broken bone was protruding from the patient's skin."  Complaint, Exhibit F.

ultimately reprinted by Defendant existed. Therefore the Court will allow the Plaintiff's claim

for false light invasion of privacy as to the March 6 article to proceed.

B.

In order to make out a *prima facie* case of intentional infliction of emotional distress,

Plaintiff must show (1) that Defendant's conduct was intentional or reckless, as well as (2)

"outrageous and intolerable in that it offends against the generally accepted standards of decency

and morality; (3) that Plaintiff experienced severe emotional distress, and (4) that there was a

causal connection between Defendant's conduct and Plaintiff's emotional distress. *Stringer v.*

*Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788 (Ky. 2004). Such claims should only proceed

where "the conduct has been so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized community." *Id.* at 789. Comparing Defendant's alleged actions beside the truly

shocking behavior that has been found to support a claim,[10] this Court simply cannot find that

Plaintiff has succeeded in making out a *prima facie* case of intentional infliction of emotional

distress as to any of the articles.[11]

IV.

Plaintiff's final allegation is that of tortious interference with business relations. To

make out a *prima facie* claim, Plaintiff must show (1) improper interference by Defendant, and

(2) "malice or some significantly wrongful conduct" by Defendant. *NCAA v. Hornung*, 754

---

[10]*See, e.g., Stringer*, 151 S.W.3d at 789–91 (listing such behavior and, more instructively, shocking behavior that was *not* deemed sufficient to form the basis for an intentional infliction of emotional distress claim).

[11]Additionally, as noted above regarding the March 18 and 31 articles, the scope of the fair reporting privilege should preclude recovery as to those articles on this tort theory as well. *See, e.g., Compuware Corp.,* 499 F.3d at 533*; Boladian,* 123 Fed. Appx. at 169; *Amway,* 346 F.3d 180; *Gray,* 562 S.W.2d 656.

14

S.W.2d 855, 858–59 (Ky. 1988).  Improper interference is determined with reference to the seven factors listed in Restatement (Second) of Torts § 767: (1) the nature of Defendant's conduct, (2) Defendant's motive, (3) the interests of Plaintiff with which Defendant's conduct interferes, (4) the interests sought to be advanced by Defendant, (5) the social interests in protecting Defendant's freedom of action and Plaintiff's contractual interests, (6) the proximity or remoteness of Defendant's conduct to the interference, and (7) the relations between Plaintiff and Defendant.  *NCAA*, 754 S.W.2d at 858–59.

As a preliminary matter, "any privilege conferred by statute applies equally to actions founded upon defamation and to actions founded upon the tort of interference with prospective economic relations."  *Gray*, 562 S.W.2d at 658.  This eliminates Plaintiff's ability to proceed with his tortious interference with business relations claim as to the March 18 and 31 articles, given that this Court has already deemed those articles covered by Ky. Rev. Stat. § 411.060's fair reporting privilege.

Additionally, as noted above, the Sixth Circuit has held that "[a] party may not skirt the requirements of defamation law by pleading another, related cause of action."  *Boladian*, 123 Fed. Appx. at 169 (citing *Hustler Magazine v. Falwell*, 485 U.S. 46, 53 (1988)).  Echoing the Supreme Court's desire to protect "the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern," *Hustler Magazine*, 485 U.S. at 50, this view reinforces the protections built into the law of defamation and precludes Plaintiff from bringing a "derivative" claim as to the March 3, 4, 5, and 13 articles once his defamation claims as to those articles were dismissed.  *See also Compuware Corp.*, 499 F.3d at 533.

Finally, as to all of the articles, the evidence currently before the Court is quite simply

insufficient to satisfy the elements of a tortious interference claim even when viewed in the light most favorable to Plaintiff.  For example, any "interference" with Plaintiff's business relations was occasioned less by Defendant's reports on the controversy surrounding RMC than by Plaintiff's actions while employed at RMC.  Additionally, the "nature of Defendant's conduct" was the publication of newsworthy information of interest to the community, and Defendant's motive cannot credibly be said to have been anything other than that motivating reports of any newsworthy issue to the public.[12]  And even if Plaintiff were viewed as having successfully made out the first element of his claim, the record reveals no "malice or significantly wrongful conduct" which would satisfy the second element of the claim.  Therefore Plaintiff's tortious interference claims cannot go forward as to any of the articles.

The Court will issue an order consistent with this Memorandum Opinion.

cc:     Counsel of Record

---

[12]Plaintiff argues that the content of a *Messenger* editorial, as well as the executive editor's assertion that he hoped to influence public opinion in editorials, fills this evidentiary gap.  The Court views this evidence as falling far short of making out a *prima facie* case of tortious interference with business relations.