UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:05CV-014-H

DR. PHILIP C. TROVER                                                    PLAINTIFF

V.

DR. NEIL J. KLUGER and PAXTON
MEDIA GROUP, L.L.C.                                                    DEFENDANTS

### MEMORANDUM OPINION

Remaining in this case are Dr. Philip Trover's ("Plaintiff") claims for defamation and false light invasion of privacy against Paxton Media ("Defendant"), based on Defendant's March 6, 2004 newspaper publication. Defendant seeks summary judgment as to the defamation claims on the grounds that publication is protected by the qualified privilege under KRS § 411.060 and that Plaintiff cannot show negligence. Defendant also seeks summary judgment as to the false light claims on the grounds that Plaintiff cannot show actual malice and as to Plaintiff's claim for special damages.

These are each potentially difficult questions. Fortunately, the Court is not confronted with an entirely blank canvas. It has addressed these and related issues in previous memorandum opinions. *Trover v. Paxton Media Group*, 2007 WL 4302088 (W.D. Ky. 2007); *Trover v. Kluger* 2007 WL 528419 (W.D. Ky. 2007). Also, the Court has been favored with fine written and oral argument from both sides. For the reasons outlined below, the Court will deny the motion as to the defamation claims and the motion as to the false light invasion of privacy claim. The Court will grant the motion to dismiss the claim for special damages.

**I.**

The events leading to this case have been outlined extensively in the Court's two prior opinions, so only a brief recitation of the pertinent facts follows. Dr. Neil Kluger, an oncologist on the staff of the Regional Medical Center ("RMC") wrote a letter ("the Kluger letter") outlining numerous complaints he had compiled against Plaintiff, a radiologist at RMC. In January 2004, Dr. Kluger sent this letter to RMC's Chief of Staff and Medical Executive Committee. Dr. Kluger also attached this letter to a complaint he sent to JoAnn Merryman with the Office of the Inspector General of the Kentucky Division of Community Health Services ("OIG") and to the Kentucky Board of Medical Licensure ("KBML"). In paragraph commentary and sixty-six numbered points, the Kluger letter alleged that Plaintiff did not properly perform his job and requested that Plaintiff be terminated.

After receiving the Kluger letter, all three recipient organizations investigated Plaintiff. Brent Lancaster investigated the Kluger letter complaint for OIG by site visit on February 10 and 11, 2004 at RMC. Following the investigation, Mr. Lancaster filed a report that concluded that the Kluger letter allegations were substantiated. This was noted on the complaint intake form. Subsequently, another complaint was filed with OIG against Dr. Trover and additional investigation substantiated those allegations as well. OIG's findings eventually led to a Notice of Deficiencies threatening to terminate RMC's Medicare and Medicaid funding.

As the investigation and allegations came to light, many local news organizations began reporting the events. Beginning March 3, 2004, Defendant published a series of articles in its newspaper *The Messenger*, reporting on RMC's and the state's investigations. The March 6 article at issue contained some of the allegations contained in the Kluger letter. As editor Tom Clinton stated in his deposition, *The Messenger* published the article without regard to the

-2-

truthfulness of the allegations made in the Kluger letter, being only concerned with reporting the Kluger letter's allegations accurately. The March 6 article only attributed the Kluger letter to the RMC proceeding.  At the same time, the local television studio News Channel 25 ("News 25") reported on information it was discovering about the investigation.  Between March 4 and 6, News 25 reported receiving a letter containing nearly seventy allegations against Plaintiff that had reportedly been sent to RMC, the State Oversight Committee, and the KBML. The Court has resolved a number of issues regarding Defendant's reporting of the events.

Defendant now argues that all claims regarding the March 6 article be dismissed.  The Court will consider each issue in turn.

## II.

The Court decides the scope of the "fair reporting privilege" as a matter of law.  *Smith v. Hodges*, 199 S.W.3d 185, 189 (Ky. App. 2005).  The privilege itself arises from the common law policy underlying the judicial proceeding privilege.  *See Begley v. Louisville Times Co.*, 115 S.W.2d 345, 348 (Ky. App. 1938).  The judicial proceeding privilege covers publications of matters within the court record.  *Helton v. Joplin*, 281 S.W.2d 917, 918 (Ky. 1955).  In 1936, the legislature codified the fair reporting privilege to strengthen and clarify it.  KRS 411.060.  It has remained unchanged ever since.  The statute "allow[s] the press to freely serve as a kind of 'government watchdog,'" to report on records of proceedings of public concern beyond those in judicial proceedings.  *Trover v. Kluger*, 2007 WL 528419,*9 (W.D. Ky. 2007).

The Court has already determined that the fair reporting privilege applies generally to the KBML and OIG proceedings.  *Id.* at  *8 and *9.  The March 6 letter in particular was a "document presented" to a state or city body, because Kluger included it as part of his complaint

to the KBML and it triggered the OIG investigation that led to a Notice of Deficiencies.  *Trover*, 2007 WL 528419, *9.  Further, OIG's investigation records indicate that the Kluger letter, attached to the complaint filed with Merryman, did lead to an investigation that substantiated Kluger's complaints.  The Kluger letter was not only filed with the government body, but it also led to an investigation that substantiated the charges of the letter.  Therefore, the fair reporting privilege does apply to the Kluger letter as presented to the KBML or OIG.

This Court has also concluded that Defendant must show its knowledge of KBML or OIG's investigation in order to avail itself of the privilege.  *Trover v. Kluger* 2007 WL 528419, *9.  There are sound reasons for this view even though KRS § 411.060 does not directly impose the 'knowledge' requirement and no Kentucky courts have addressed the question.  From the context of its origin, the fair reporting privilege focuses on the public's interest in the record or reports of government proceedings.  *See* Restatement (Second) of Torts § 611 cmts d, e.[1]  Its underlying policy is to encourage broad dissemination of public records.  *Bufalino v. Associated Press*, 692 F.2d 266, 271 (2d Cir. 1982).  The Court does not believe, however, that Kentucky courts would hand news reporters a carte blanche privilege.  To exercise the watchdog role legitimately, the publisher must have knowledge that he or she is reporting on a relevant

---

[1] *See also Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985)(stating that the privilege intends to encourage "the media to disseminate official records" and holding that "[t]he privilege is inapplicable if it is unclear that the article is a report on or summary of an official document or proceeding); *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 534, 536 (7th Cir. 1982)(concluding that the Illinois fair report privilege "recognized by the trial court was a privilege for statements based on public documents."  Holding that the privilege does not apply to publication of "a statement in the record of a public proceeding [that] is merely part of one's research, and . . . used to support an assertion not made in the public document."); *Medico v. Time, Inc.*, 509 F. Supp. 268, 276 (E.D. Pa. 1980)(stating that an absolute privilege extends to information "contained in public records and derived therefrom," but not to material "received from other than the public record." (citing *Times-Dispatch Publishing Co. v. Zoll*, 139 S.E. 505, 507 (Va. 1927)); *Mathis v. Philadelphia Newspapers, Inc.*, 455 F. Supp. 406, 417 (E.D. Pa. 1978)(declining to grant summary judgment where the source of printed material was unclear and therefore the court could not conclude that the article at issue was "a report of a governmental report."); *O'Neal v. Tribune Co.*, 176 So.2d 535, 546 (Fla. Dist. Ct. App. 1965)(stating that the privilege is meant to apply to "publication of matter concerning which the public has a right to be informed");.

proceeding. The Second Circuit has viewed the privilege in a similar way, concluding that the privilege is inapplicable "where the media does not directly or indirectly rely upon official records" because the media does not fulfill the underlying policy of the privilege. *Bufalino*, 692 F.2d at 271. It follows that, in our circumstances, Defendant must know that the letter was filed with the KBML or OIG and was a part of its investigation; otherwise there is no rationale for extending the privilege. To qualify for the privilege, therefore, the Court concludes that Defendant must show knowledge of an ongoing proceeding and that the Kluger letter was a part of it.[2]

### A.

A careful review of the current record reveals insufficient evidence of the required knowledge. None of *The Messenger* articles identify the Kluger letter as part of a government investigation. In *The Messenger's* March 3 article, Defendant reports OIG's February 18 investigation resulted from RMC's internal investigation, but it does not acknowledge the Kluger letter, complaints, or the subsequent site visit. *The Messenger's* March 5 article reported that government officials were responding to a formal complaint, but did not specify who may have made that complaint. The March 5 article reported that an inspection took place on February 26, but never indicated specific knowledge of earlier complaints or investigations, which would include the relevant letter and ensuing investigation.

Looking at the larger context of the publication does not seem to help Defendant's case. Defendant asserts that its own previously published articles combined with News Channel 25's

---

[2] Professor David Leibson also agrees that Kentucky favors the Bufalino approach. DAVID J. LEIBSON , KENTUCKY PRACTICE SERIES, TORT LAW, § 15.19, current through 2007 pocket part.

reporting created a context of "public knowledge" that Dr. Kluger's complaint initiated the

Medicare investigation and was a part of government proceedings.  On the March 4 evening

broadcast, News 25 reported that it had "a letter outlining the problems several other doctors

brought to state officials concerning Dr. Phillip Trover."  (Pl's Resp. to 3d Mot. for Summ. J.,

Ex. 15 at 13.)  The report went on to say, "News 25 uncovers a list of allegations against Dr.

Phillip Trover," and that the letter contained nearly seventy complaints "reportedly sent to the

Hospital's Board and the State Oversight Committee."  (*Id.* at 14, 15.)  News 25 also reported

having a "letter written by a Madisonville physician, sent to the Hospital's medical review

committee, the Clinic's Board of Governors and even the Kentucky Board of medical

Licensure."  *Id.* at 15.  News 25 repeated similar statements on the March 4 ten o'clock news and

the March 5 five a.m. and 11:30 a.m. broadcasts.  Although News 25 possessed and accurately

described the Kluger letter, this does not indicate that any investigation resulted from its

possession.  The broadcasts permit the inference that Defendants may have known that KBML

had the Kluger letter, but they give no clear indication that OIG had the Klugger letter.  Taken

together, these reports provide rather weak inferences of the required knowledge.

Finally, Defendant's own statements fall startlingly short of showing that Defendant had

actual knowledge at the time of publishing that the Kluger letter was a part of a government

proceeding.  Defendant's editor and writer gave deposition testimony indicating their belief that

the letter they received was part of an investigation, but neither states their basis for that belief.

The Kluger letter itself provides no basis for such a belief.  The newspaper's copy was only

addressed to Dr. Gerald Dysert of RMC and had no signature.  Consequently, at this time, the

testimony is insufficient to conclude the newspaper knew the letter was part of a government

proceeding.  Whether the actual evidence at trial may alter that conclusion is, of course, a matter for later consideration.

### B.

Even if Defendant meets the knowledge requirement, the fair reporting privilege is likely unavailable here because the news article must also convey a fair and impartial summary of the relevant proceedings.  *Pearce v. Courier-Journal*, 683 S.W.2d 633, 637 (Ky. App. 1985); *Kremer v. Kopmeyer*, 418 S.W.2d 237, 240 (Ky. App. 1967).  Some courts have said that "fair reporting" has a particular meaning in the context of the privilege, that the reference to a particular document must be properly attributed.  *Bufalino*, 692 F.2d at 271.[3]  Once again, Kentucky courts have not ruled definitively on this precise requirement as a matter of law.

The privilege's basis is "the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings."  *Id.*  The underlying purpose limits the extension of the privilege by illuminating "fair reporting." So if  "the report is written in such a manner that the average reader would be unlikely to understand the article (or the pertinent section thereof) to be a report on or summary of an official document or proceeding," it cannot be said to convey a fair and impartial summary of the proceedings.  *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985).

The importance of attribution stems from "an understanding that the intended beneficiary of the privilege is the public, not the press."  *Id.*  The public's interest is in what is being done and said in government, not merely in any individual's comment on a potentially public issue.

---

[3] *See also White v. Fraternal Order of Police*, 909 F.2d 512, 528 (D.C. Cir. 1990); *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985); *Lee v. Dong-A Ilbo*, 849 F.2d 876, 884 (4th Cir. 1988); *Ditton v. Legal Times*, 947 F. Supp. 227, 230 (E.D. Va. 1996); *Prins v. Int'l Tel. and Tel. Corp.*, 757 F. Supp. 87, 93 (D. D.C. 1991); *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 89 (D.C. 1980).

Thus, the public's interest is only served if the reader understands that the article describes government proceedings.  *Id.*  It is hardly surprising, therefore, that the Kentucky Supreme Court has suggested that fair and accurate reporting in these circumstances might well require that the March 6 article properly attribute the letter to the relevant government proceedings.  This is necessary so that the article can provide a "substantially accurate account of any proceedings before the board."  *Pearce*, 683 S.W.2d at 637.

Under this reasoning, because the March 6 article makes no reference to the Kluger letter being a part of the KBML or OIG proceedings, it may not present a "substantially accurate account" of those proceedings.  The reader can only speculate whether the Kluger letter was part of any *government* investigation.  While the article properly states that "the Centers for Medicare and Medicaid Services in Atlanta, Ga., were in the process of its [sic] own look into the hospital's quality assurance measures," it never identifies the letter as part of the KBML or OIG proceeding.   In fact, it never states that the Kluger letter was sent to any agency or that it was part of any investigation.

To be sure, fairness and impartiality can be assessed in the context of the series of articles.  While the March 6 article does properly attribute the allegations against Plaintiff to the letter, it is more pertinent in the context of the fair reporting privilege that the article never attributes the letter to a relevant investigation.  Only the March 5 article indicates that a government investigation resulted from any complaint, although it does not specify the nature of that complaint.  The March 6 article makes no attribution concerning the Kluger letter.

The Court concludes that Kentucky courts would adhere to the policy underlying the fair reporting privilege.  This purpose and policy requires proper attribution so that the reader can

judge the veracity of statements, which the privilege protects from the normal scrutiny of defamation.  Consequently, the fair reporting would not apply in these circumstances, unless new evidence comes to the Court's attention.

## III.

Where the fair reporting privilege is inapplicable, to recover for defamation, Plaintiff must show that Defendant acted negligently.  *McCall v. Courier-Journal*, 623 S.W.2d 882, 886 (Ky. 1981).   Evidence must exist that Defendant failed to exercise "reasonable care and caution in checking on the truth or falsity and the defamatory character of the communications before publishing it."  *Id.* (citing *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 418 (Tenn. 1978)). In assessing whether Defendant acted reasonably, the jury may consider the publishing deadline and the nature of the news being reported as aspects of the circumstances the publisher faced. *See Associated Press v. Walker*, 388 U.S. 130, 158-59 (1967).

Defendant asks the Court to decide that Plaintiff cannot show that Defendant was negligent in publishing the March 6 article.  Summary judgment is appropriate where there exists no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists where, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Here, sufficient evidence on record calls into question whether Defendant acted reasonably.

## A.

Defendant makes the reasonable argument that the newsworthiness of these events required immediate publication in these circumstances.  However, the evidence permits other

less flattering inferences as well.  Defendant may not be required to conduct a specific kind of investigation.   Yet Plaintiff's expert witness, an associate professor of journalism, says that Defendant did not satisfy journalism standards of truth and fairness when publishing the March 6 article.  The professor says that Defendant should have contacted Plaintiff, Dr. Kluger, and the parties who made the statements in the letter before publishing the article.  The parties dispute whether Defendant actually contacted Plaintiff.  Defendant did, however, contact Dr. Kluger's wife, but did not speak with Dr. Kluger himself before publishing excerpts of the letter.  No evidence exists that Defendant attempted to contact any of the anonymous declarants whose statements constitute the Kluger letter.  Given the serious nature of the allegations in the letter, Defendants' investigation may be viewed as not satisfying the minimum standard of care in these circumstances.

The Parties also dispute the falsity of the statements.  Defendant has put on no evidence supporting the assertion that all the statements contained in the Kluger letter are true. On the other hand, Plaintiff has submitted extensive testimony questioning the validity of the statements and tending to show their falsity.  Given the evidence presented to the Court at this time, the Court cannot conclude that the statements published in the article are all true.

Because material evidence questions the truthfulness of the statements and Defendant's efforts to verify their truthfulness prior to publishing, summary judgment is inappropriate at this time.

### B.

Plaintiff must also show an injury to reputation as a substantive element of defamation. *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 273 (Ky. App. 1981).  Injury to reputation is

presumed, however, where the statements are libelous per se.  *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 794 (Ky. 2004); *Marcus & Millichap Real Estate Inv. Brokerage Co. v. Skeeters*, 395 F.Supp.2d 541, 554 (W.D.Ky 2005).  Statements that charge unfitness to perform duties of one's profession and subject the person to public disgrace, ridicule, and contempt are defamatory per se.  *Hill v. Evans*, 258 S.W.2d 917, 918 (Ky. 1953); *Baker v. Clark*, 218 S.W. 280, 283 (Ky. App. 1920).   The statements published in the March 6 article directly questioned Plaintiff's ability to perform his profession.  The Kluger letter accused Plaintiff of failing to prevent a patient's death and regularly misreading film, questioned Plaintiff's mental stability, and questioned his judgment and work performance.  Since the statements directly question Plaintiff's fitness in his profession, harm can be presumed.

## IV.

The prima facie case of false light invasion of privacy requires a higher level of proof. Plaintiff must show that "(1) the false light in which [Plaintiff] was placed would be highly offensive to a reasonable person, and (2) [Defendant] had knowledge of, or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [Plaintiff] was placed." *McCall*, 623 S.W.2d at 888.  The second element requires a showing of actual malice. *Id.*  Summary judgment is inappropriate where there is any evidence of actual malice or malice in fact.  *Stringer*, 151 S.W.3d at 798-99.  Failure to investigate before publishing does not show actual malice, but it can be probative of malice.  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989); *Warford v. Lexington Herald-Leader Co.*, 789 S.W.2d 758, 772 (Ky. 1990).

Although this is a close question, the evidence may permit an inference that the

publication was malicious.  The number of statements published, seriousness of the allegations, the ease with which any single statement could have been removed from the article, and the attitude Tom Clinton displayed in his deposition call into question Defendant's motives when publishing.  The March 6 article contained at least thirteen (13) specific potentially defamatory statements.  These statements expressed serious doubt as to whether Plaintiff properly performed his job and even suggested his actions resulted in a patient's death.  Tom Clinton testified in his deposition that, when publishing the March 6 article, he did not care whether the statements in the Kluger letter were true, but was only concerned with accurately reporting the statements themselves.   However, the principal news of the article was accurately conveyed even without the specific references to the Kluger letter.  Although no single fact implies the March 6 article was published maliciously, the totality of the circumstance may well support that inference.

## V.

Special damages support economic losses proximately caused by defamatory statements. *Columbia Sussex,* 627 S.W.2d at 274.  To recover special damages, Plaintiff must show a reasonably certain direct or proximate relationship between the allegedly defamatory communication and the claimed damages.  *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1083 (W.D. Ky. 1995).  Plaintiff seeks lost wages and relocation expenses on the theory that harm to his reputation caused him to be fired and move his practice.  However, Plaintiff presents no evidence supporting a causal connection between the March 6 article and his employment termination and loss of his medical license.  RMC terminated Plaintiff based on its internal review.  KBML suspended Plaintiff's license, in July 2005, based on its own review.  Those two events led Plaintiff to seek work outside the state, which is the basis of his special damages

claim.  Suspension alone would have led him out of state to practice. Neither can Plaintiff show that Defendant proximately caused third parties to file lawsuits against the Plaintiff.  None of Plaintiff's special damages appear to be a proximate result of the March 6 article's publication.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record